5 F.3d 685
 PARKWAY GARAGE, INC., Appellant in No. 92-1828,
v.
The CITY OF PHILADELPHIA; The Philadelphia Parking
Authority; Webster M. Fitzgerald; Donald
Kligerman; Andres Perez;
The Philadelphia Parking Authority, Appellant in No. 92-1905.
 Nos. 92-1828, 92-1905.
 United States Court of Appeals,
Third Circuit.
 Argued June 10, 1993.
Decided Sept. 22, 1993.
As Amended Nov. 26, 1993.
Sur Petition for Rehearing En Banc
Dec. 17, 1993.
 
 Samuel E. Klein (argued), Dechert Price & Rhoads, Harold E. Kohn, Robert J. LaRocca, Joanne Zack, Kohn, Nast & Graf, P.C., Philadelphia, PA, for Parkway Garage, Inc.
 Bonnie Brigance Leadbetter (argued), Fineman & Bach, P.C., Philadelphia, PA, for Philadelphia Parking Authority.
 Lek Domni (argued), Office of City Sol., Philadelphia, PA, for City of Philadelphia.
 Before: GREENBERG, NYGAARD, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 The primary issue raised by this appeal is what quantity of evidence suffices to prove personal knowledge and improper motive on the part of the principal official of a municipality, under 42 U.S.C.A. Sec. 1983 (West 1981 & Supp.1993), in his decision to terminate a binding written contract. We must also interpret a contractual provision relating to the assessment of the costs of arbitration between the defendants, the City of Philadelphia (City) and the Philadelphia Parking Authority (Authority), and the plaintiff in this case, Parkway Garage, Inc. (Parkway). Finally, the parties to this appeal call upon this court to predict whether the Pennsylvania Supreme Court would allow a cause of action for breach of an implied covenant of good faith under the facts of this case.
 
 
 2
 Parkway filed this civil rights claim against the City and the Authority as garage owner and landlord, respectively. The complaint alleged that the City and the Authority misused the City's police power of the Licenses and Inspections Department (L & I Department) to benefit themselves in their proprietary and economic capacities as garage owner and landlord in violation of Sec. 1983.
 
 
 3
 After a fourteen-day trial on the merits, preceded by lengthy preliminary skirmishes, a jury returned a verdict in Parkway's favor for $5 million on its civil rights claim, finding the Authority and the City jointly and severally liable. The jury also found in favor of Parkway on the pendent state claim for breach of the implied covenant of good faith, assessing an additional $1,000,000 in damages against the Authority. Finally, the district court assessed the costs of a prior arbitration between the parties over an alleged breach of the lease between Parkway and the Authority.
 
 
 4
 The City and the Authority filed motions for judgment notwithstanding the verdict (JNOV) on all claims under Federal Rules of Civil Procedure (Rules) 50 and 59.[1] The district court granted the motions for JNOV on the civil rights verdict, but denied the Authority's motion for JNOV on the breach of the implied covenant of good faith. Parkway timely appealed the grant of the motion for JNOV on the Sec. 1983 claims, and the Authority cross-appealed the verdict on the pendent state claim. Parkway also appealed the assessment against it of the costs of arbitration. We reverse.[2]
 
 I.
 
 5
 The City owns valuable land located in Central City at 15th and Arch Streets, which it leases to the Authority. In 1963, the Authority entered into a 36 year sublease with John McShain, Inc. (McShain), under which McShain agreed to build and operate an underground parking garage (the garage). McShain built the garage between 1963 and 1965, with a structural reserve strength far in excess of the City's building code requirements. Dr. Mete Sozen, a nationally known engineer, testified that the garage was constructed with a "live load" capacity of 350 pounds per square foot. Testimony showed that the actual maximum live load that could be physically present in the garage, assuming full capacity, was 20-25 pounds per square foot. Therefore, the garage was constructed to bear 14 to 18 times the live load that could actually occupy it.
 
 
 6
 Under the terms of the lease between the Authority and McShain, McShain retained 87.5% of the gross receipts, and remitted the remaining 12.5% to the Authority. The Authority in turn paid all of the net revenue to the City. In 1972, Parkway purchased from McShain as assignment of the construction and lease agreement (the lease), for a total of $4,575,000. Over the years, the market value of the property increased substantially, as did the fees for parking. Consequently, Parkway's income stream from the garage increased to $1.25 million by 1980, and reached $2.4 million by 1990.
 
 
 7
 In 1987, the City commissioned First Boston, its financial advisor, to prepare a report on the feasibility of selling the parking garages owned by the City. The report, dated September 4, 1987, advised the City that Parkway's lease at this garage "would limit [the] sale price of the facility." Thus, stated in terms of feasibility, the City could realize a greater amount of money in selling the garage if it were not burdened with Parkway's lease. However, Parkway's lease would not expire until 1999. Parkway asserts that the City's desire to augment the value of its asset, the garage, represents the real motive behind the City's repeated efforts to break the lease and its ultimate summary closing of the garage.
 
 
 8
 It is undisputed that the garage suffers from spalling caused by salt from the tires of cars entering it in the winter season. The salt rusted the garage's steel rebars and caused the delamination and deterioration of the surrounding concrete. In 1986, Parkway commissioned an engineering firm to survey the garage and offer suggestions for repair. The engineering firm suggested two solutions: (1) that Parkway rebuild portions of the garage in order to arrest the corrosion over the long term; or (2) that Parkway repair the portions of the garage that have rusted. Such repairs were estimated to last approximately 15 years.
 
 
 9
 Soon thereafter, Parkway offered the Authority a proposal: it would structurally rebuild portions of the garage at its expense in exchange for an extension of the lease. The Authority rejected this proposal out of hand and refused to negotiate, asserting that Parkway had an obligation to rebuild the garage without the benefit of a lease extension. The Authority asserted that Parkway's lease expressly required the tenant to perform all repairs necessary to keep the garage in good order and repair. Parkway, on the other hand, contended that its responsibility extended only to ordinary maintenance. Therefore, argued Parkway, its responsibility was limited to repairs, and it was thus not obligated to rebuild the garage for the lessor or make structural repairs. Hence, Parkway never contested its obligation to correct the corrosion; rather, the parties' dispute focused on the City and its Authority's insistence that Parkway structurally rebuild the garage.
 
 
 10
 The Authority thereupon issued an ultimatum that Parkway rebuild the garage or be declared in default of its lease and threatened to terminate possession. To that end, the Authority filed a number of lawsuits in 1987 and 1988 in the Court of Common Pleas of Philadelphia in an attempt to forfeit Parkway's interest in the lease. The Authority's stated reason for the suits was the disagreement with Parkway over its refusal to rebuild the garage. Ultimately, the state court ordered all three actions to arbitration.
 
 
 11
 In January, 1990, the American Arbitration Association empaneled three arbitrators to decide the dispute. They conducted extensive hearings until October 1990, during which time the panel heard 25 days of expert and layman testimony. They received many reports and hundreds of exhibits, and heard testimony from both parties' expert engineers. The Authority's prayer for relief sought a finding that Parkway had breached the lease. The Authority contended that Parkway's breach of the lease required that Parkway demolish the garage and replace it with a new garage without charge. Failing that, the Authority demanded either a $10,385,225 award to finance the rebuilding of the garage or the termination of Parkway's lease.
 
 
 12
 The arbitrators, however, did not grant the Authority the relief that it had requested. They did not award the Authority any money damages and they did not find Parkway in breach of its lease. They also did not find that Parkway was required to rebuild the garage. Rather, the arbitrators ordered Parkway to make certain patch and seal repairs and to conduct load tests throughout the remainder of its lease. Significantly, the panel agreed with Parkway that it was obligated to repair but not rebuild the garage.
 
 
 13
 On October 5, 1990, the City, without notice to Parkway, peremptorily closed three floors of the garage, claiming that those floors were in danger of collapse. This closing took place notwithstanding: (1) the garage had passed extensive load testing in March, 1989; and (2) the opinion of the Authority's expert engineer, Michael Brainerd, that the garage was not in imminent danger of collapse.
 
 
 14
 Parkway promptly met with City officials and reached what thereafter became known as the "October Agreement." The City promised to reopen the three floors and, in exchange, Parkway agreed to: (1) have an independent engineer issue a letter report stating that the garage was safe; (2) periodically load test the garage; and (3) remove "spoiled" or broken concrete from the ceiling of the garage. Upon Parkway's compliance with these conditions, the City reopened the three floors of the garage.
 
 
 15
 Despite Parkway's compliance with the October Agreement, on the evening of December 4, 1990, City officials, again without notice to Parkway, summarily closed the entire garage, claiming that it was in "imminent danger of collapse." The closing on December 4 took place pursuant to a meeting of high officials of the City and the Authority on December 3. The meeting was held at the office of W. Wilson Goode, then Mayor of Philadelphia (the Mayor or Mayor Goode), and the participants included David Fineman and Mitchell Bach, the Authority's attorneys, officials of the Licenses and Inspections Department, and the Mayor personally. Neither Parkway nor its counsel had prior knowledge of this meeting and they received no invitation to attend.
 
 
 16
 Parkway immediately attempted to persuade the City to reopen the garage, offering to conduct load tests to demonstrate the stability of the garage. The City, however, refused to accept these load tests as evidence in favor of reopening the garage notwithstanding provisions of the City building code that clearly state that load testing is the procedure by which to verify building stability. Moreover, Michael Brainerd, the City's engineer, had testified before the arbitration panel on February 16, 1990, that load testing was the only way to determine whether a structure was unsafe.
 
 
 17
 Despite the City's refusal to accept the load tests to determine the stability of the garage, Parkway load tested the garage between December 17, 1990 and January 4, 1991. In those tests, supervised by engineer Dr. Mete Sozen and independent City engineer Carl Walker, the garage showed no signs of failure, even at levels four to six times the maximum capacity of the garage.
 
 
 18
 The City offered three bases for its conclusion that the garage was in imminent danger of collapse: (1) a letter to that effect written on November 20 by Martin Liberman, an engineer in the City's Public Property Department, which is the department that owns the garage; (2) two letters to that effect written by Michael Brainerd on November 1st and 27th; and (3) a "walk through" tour of the garage conducted by Liberman and David Wismer, the Deputy Commissioner of L & I.
 
 
 19
 Parkway claims, however, that the garage was not in the slightest danger of collapsing and that the City and the Authority conspired to close it to benefit themselves in their proprietary and economic capacities. Parkway further contends that this was a violation of its constitutional rights and of the Authority's implied covenant of good faith as a landlord.
 
 II.
 A. The Defendants' Motions for JNOV
 
 20
 Parkway raises a threshold question with respect to defendants' motion for JNOV. Parkway asserts that the City and the Authority did not raise the issue of the lack of scienter in their motions for directed verdicts, and therefore the district court had no authority to grant JNOV. See Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 183 (3d Cir.1992) ("In order to preserve an issue for judgment n.o.v., the moving party must timely move for a directed verdict and specify the grounds for that motion."), cert. denied, --- U.S. ----, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993).
 
 
 21
 However, we believe that the City and the Authority did implicitly raise the issue of scienter in their motions for directed verdicts. The reason that a party must first set forth its argument for JNOV in a motion for directed verdict is to give the non-moving party an opportunity to correct any overlooked deficiencies in the proof of its case. Fed.R.Civ.P. 50 advisory committee's note; see also Acosta v. Honda Motor Co., 717 F.2d 828, 831-32 (3d Cir.1983) (specificity requirement in Rule 50 primarily serves as a "notice provision"). In Fineman, 980 F.2d at 184, this court found Rule 50's specificity requirement met where the moving party:
 
 
 22
 argue[d] the factual components of an insufficiency of evidence claim in terms which adequately apprised the district court and the plaintiffs' counsel of the reasons for its motion. Because Armstrong raised the factual components, plaintiffs' counsel was clearly on notice of the legal rubric under which Armstrong planned to proceed.
 
 
 23
 In the present case, the directed verdict motion of the Authority and the City gave Parkway ample notice that the defendants were going to dispute that the Mayor possessed scienter, as they stated:
 
 
 24
 4. Plaintiff could not prevail because the City's actions were motivated by the general welfare of the public and safety concerns....
 
 
 25
 Similarly, in its motion for JNOV, the City asserted that Parkway failed to prove that "the City's action was motivated by a conspiracy against plaintiff"; rather, "the City's actions were motivated by the general welfare of the public...."
 
 
 26
 Therefore, both in their motions for directed verdict and JNOV, the City and the Authority gave Parkway adequate notice that they were going to argue that the Mayor acted in good faith in closing the garage; in other words, the defendants gave implicit notice that they planned to contest that Parkway had proven scienter on the part of the Mayor. It seems that arguing that the Mayor acted in good faith is the mirror image of arguing that he did not act with scienter, i.e., an improper motive, in closing the garage. Therefore, the defendants did raise the scienter issue in their motion for directed verdict, although perhaps a bit obliquely, and it sufficed to render scienter a proper ground upon which to grant a motion for JNOV.
 
 
 27
 Hence, we turn to the merits of the claim to determine whether the district court correctly found that Parkway produced no evidence of scienter on the part of the major policy making officials and that it appropriately granted the defendants' motions for JNOV.
 
 
 28
 In deciding whether to grant a motion for JNOV, the trial court must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the "minimum quantum of evidence from which a jury might reasonably afford relief." Keith v. Truck Stops Corp., 909 F.2d 743, 745 (3d Cir.1990) (citations omitted). The court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury. Blair v. Manhattan Life Ins. Co., 692 F.2d 296, 300 (3d Cir.1982). The court may, however, enter judgment notwithstanding the verdict if upon review of the record, it can be said as a matter of law that the verdict is not supported by legally sufficient evidence. Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205, 1210 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).
 
 
 29
 We apply a plenary scope of review to a judgment n.o.v. In doing so, we must be especially vigilant to keep foremost the question whether there is sufficient evidence of record to sustain the verdict of the jury. Reviewing the record in the light most favorable to the non-moving party, judgment n.o.v. may not stand "unless the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.' " We must refrain from passing judgment on credibility issues; our task is to examine the record dispassionately for any evidence from which the jury may have rendered its verdict.
 
 
 30
 Fineman, 980 F.2d at 190 (citations omitted).
 
 
 31
 The district court granted the City's motion for JNOV because it concluded that Parkway had not produced any evidence of "scienter-like" intent on the part of Mayor Goode or Managing Director Pingree, the City's top policymaking officials, to deprive Parkway of its constitutional rights.
 
 
 32
 Substantive due process protects citizens from arbitrary and irrational acts of government. Rogin v. Bensalem Township, 616 F.2d 680, 689 (3d Cir.1980), cert. denied sub nom. Mark-Garner Assocs., Inc. v. Bensalem Township, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). A violation of substantive due process rights is proven: (1) if the government's actions were not rationally related to a legitimate government interest; or (2) "if the government's actions in a particular case were in fact motivated by bias, bad faith or improper motive...." Midnight Sessions, Ltd. v. City of Phila., 945 F.2d 667, 683 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992). The first inquiry is for the court to decide as a matter of law, while the second is a question of fact for the jury to decide. Id.
 
 
 33
 It is well established that a municipality cannot be held liable under Sec. 1983 for the actions of its employees on a theory of respondeat superior. Monell v. Department of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). Rather, a municipality is subject to direct liability only where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible." Id. at 694, 98 S.Ct. at 2037-38. Moreover, to hold the City liable for municipal policy or procedure, "scienter-type evidence must have been adduced with respect to a high-level official determined by the district court, in accordance with local law, to have final policymaking authority in the areas in question." Simmons v. Philadelphia, 947 F.2d 1042, 1063 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992).
 
 
 34
 Among the specific interrogatories submitted to the jury with respect to due process were the following:
 
 
 35
 1. Do you find by a preponderance of the evidence that plaintiff Parkway Garage Inc.'s right to due process was violated by defendant the City of Philadelphia?
 
 
 36
 2. Do you find by a preponderance of the evidence that defendant the Philadelphia Parking Authority conspired with defendant the City of Philadelphia to deprive plaintiff Parkway Garage, Inc. of its right to due process?
 
 
 37
 The jury responded "yes" to each of the foregoing interrogatories.
 
 
 38
 We must determine, in light of the district court's determination to set aside the verdict of the jury, whether the record contains the minimal quantity of evidence to justify the jury's findings. Stated in the specific terms of this case, does the record show that the plaintiff produced sufficient evidence that Mayor Goode (and/or Managing Director Pingree) knew or recklessly disregarded the relevant facts that disclosed that the garage was not in imminent danger of collapse when he summarily decided to close it on December 4, 1990?[3] We believe that it does.
 
 B. The Scienter Evidence
 
 39
 First, the Mayor had the garage closed on December 4, 1990, without conducting any load tests. Load testing is the engineering procedure of placing weights upon a structure and studying in minute detail the behavior of the structure. The Philadelphia Building Code (PBC) has adopted the BOCA National Code, Philadelphia v. Board of License & Inspection Review, 139 Pa.Cmwlth. 240, 244 n. 2, 590 A.2d 79, 82 n. 2, appeal denied, 529 Pa. 625, 600 A.2d 540 (1991), which provides for load testing to resolve any "reasonable doubt as to the stability or load carrying capacity of a completed building." Id., 590 A.2d at 82 & n. 4. Dr. Mete Sozen, the chairman of the American Concrete Institute, testified in this case: "[I]f there is controversy ... then typically the test is used on the assumption that one test is worth a thousand opinions." He also stated that the load test is "the final arbiter, the final step in any dispute about safety or serviceability of a structure." In fact, Michael Brainerd, the City's independent engineer, testified before the arbitration panel on February 16, 1990, that load testing was the only way to determine whether a structure was unsafe.
 
 
 40
 Thus, if the imminent collapse of the garage was what motivated the Mayor and other high City officials to close the garage, they should have performed load testing, as they had on prior occasions. Because the City closed the garage without conducting any load tests or any meetings or written communications with any official or representative of Parkway concerning any developing safety questions on the condition of the garage, the jury could reasonably have found the City's stated reason for the closing quite suspect.
 
 
 41
 In fact, extensive load tests were conducted in March, 1989, and again between December 17, 1990, and January 4, 1991. These tests revealed that the garage was able to withstand more than four times the maximum possible live load of cars and pedestrians that could occupy the garage at any given time. The latter load test, which proved that the garage was not in danger of collapse, was conducted only 13 days after the Mayor closed the garage.
 
 
 42
 Furthermore, the Mayor ordered the garage closed less than three weeks after Parkway had complied with specific repairs previously ordered by the City. On October 5, 1990, the City closed three floors of the garage for what it cited as safety reasons--the spoiling of the concrete and the rusting of the reinforcement rods--and not the issue of load capacity. On October 11 and 12, Parkway complied with a modification by the City that the monitoring be done on a continual basis as opposed to at least once a month. Parkway received written approval of the repairs from City officials on October 19, 1990. The City stipulated that Parkway "conducted the repairs in response to that violation with our approval and we approved all the work." Pursuant to its agreement, Parkway completed the last repair on November 14, 1990. The City permitted Parkway to reopen the garage, thus apparently concluding that the garage was in no danger of imminent collapse.
 
 
 43
 In the meantime, the Authority had consulted with its engineer, Brainerd, while repairs were still in process. On November 1, 1990, it had obtained a letter from Brainerd in anticipation of its and the City's plan to close the garage. Therefore, while certain City officials were approving Parkway's repairs, others were concomitantly conducting meetings in a continuing effort to close the garage, adding to the suspect nature of the defendants' activities.
 
 
 44
 Moreover, the jury could have reasonably found that the City's and the Authority's actions leading up to the closing of the garage belie a proper motive for the closing. The City closed the garage on December 4th purportedly because it was in imminent danger of collapse. Imminent danger of collapse, as defined by the BOCA National Code and the PBC means:
 
 
 45
 When, in the opinion of the Code official, there is actual and immediate danger of failure or collapse of a building or structure or any part thereof which would endanger life, or when any structure of part of a structure has fallen and life in endangered by the occupation of the building structure....
 
 
 46
 Philadelphia v. Board of L & I, 590 A.2d at 82.
 
 
 47
 The City cited three bases for its decision to close the garage: (1) the two letters from Brainerd, the Authority engineer, written on November 1st and 27th; (2) the November 20th letter of Martin L. Liberman, Chief Civil Engineer for the City's Public Property Department, which is the department that owns the garage; and (3) the "walk through" tour of the garage conducted by Wismer, the Deputy Commissioner of L & I.
 
 
 48
 Although Parkway was at the time in the process of negotiating and repairing the garage following the October 5th closing, and the arbitration hearings were in process, Parkway Authority's attorneys met with the L & I Commissioner Kligerman and other city officials as early as October 9, 1990, including their solicitors. Following that meeting, Brainerd, the Parking Authority's consulting engineer, was requested to put his findings concerning the garage in writing. Brainerd provided a letter summary which Fineman transmitted to the City Solicitor on November 5, 1990. This letter did not suggest that the City close the garage. Also, he did not send a copy to Parkway or any of its representatives.
 
 
 49
 On November 18, 1990, just four days after Parkway had completed all of its repairs pursuant to the October Agreement and L & I inspectors had found them satisfactory, Fineman received a call from the Mayor's Chief of Staff to attend a meeting that day at the Mayor's office. Among those present at the meeting were the Mayor, Commissioner of the L & I Kligerman, Commissioner of Public Property Perez, the City Solicitor, and Fineman. Parkway had no notice of the meeting and had no representative present. Those present discussed Brainerd's letter.
 
 
 50
 Fineman testified at trial that in the course of the discussion, the Mayor said that he had read Brainerd's letter of November 1, and that if Brainerd believed the garage should be closed, he ought to put that into a letter. The next day Fineman telephoned Brainerd to inform him of the substance of the meeting in the Mayor's office the previous day and the Mayor's position with respect to Brainerd's November 1st letter.[4]
 
 
 51
 Brainerd followed up Fineman's telephone call by revising his original letter on November 27, 1990. The revised letter substantially reiterated Brainerd's letter of November 1st, but contained an additional paragraph stating, for the first time, that the garage should be closed.
 
 
 52
 Interestingly, Brainerd had not conducted any further investigation, research, or inspection of the garage between the time he drafted the first letter, in which he did not opine that the garage should be closed, and the time he drafted the revised letter, which now included the recommendation to close the garage. Thus, it was reasonable for the jury in this case to conclude that Brainerd's revised letter that suggested that the garage be closed was really a response to the Mayor's request to find a way to terminate Parkway's lease in order to realize economic gain for the City and the Authority.
 
 
 53
 In anticipation of a forthcoming meeting with the Mayor, Liberman issued a report on the garage on November 20, 1990. The report stated that he had reviewed an engineering report of A & R Engineering of April 3, 1987, the letters of Carl Walker Engineers dated November 19, 1990, and a letter from the engineering firm of Simpson, Gumpertz, & Heger of November 1, 1990. Based on these sources, Liberman's report recommended "that the garage be closed immediately and abandoned or reconstructed."
 
 
 54
 However, Liberman's report did not state that the garage was in imminent danger of collapse. Also, his recommendation is inconsistent with his conclusion at a meeting a few days before with Deputy Commissioner of L & I, Wismer, and Assistant Director Kham, of the City's Architecture and Engineering Division, that they should withhold any decision concerning the continued safety of the garage until they receive the result of the load tests to be conducted in January 1991. In fact, Liberman testified at the trial that, although not asked by his superiors for his views at the time, it was his opinion on December 4th that there was no probability at that time of an imminent collapse of the garage. He also stated that his opinion that the garage should be closed was based entirely on the now suspect Brainerd letter.
 
 
 55
 On November 30th, Kligerman, Liberman, and Wismer met with Managing Director Pingree to brief him and a representative of the City's legal department on these developments. They all concluded that the garage was no longer safe and should be closed. The next morning the Managing Director met with the Mayor to report the substance of the meeting the day before. The City gave no notice of those meetings to Parkway. Several days later, on December 3rd, Liberman and Deputy Commissioner Wismer decided to "walk through the garage." On the basis of his visual inspection of the cracking of the new top surface concrete, Wismer now concluded that, without ordering another load test, the garage was in imminent danger of collapse. This testimony contradicted his pre-trial deposition that was read to the jury, where he testified that Liberman's letter of November 20th was the sole basis for the closure notice.
 
 
 56
 It was also reasonable for the jury to determine that Wismer's testimony was incredible, and that the Mayor's true motive for closing the garage was economic. Wismer, an L & I official and hardly an impartial observer, took no pictures of the supposed damage that he saw, nor did he document his inspection. He did not notify Parkway that he had found damaged parts of the garage. Wismer also did not exercise his right to close the garage upon allegedly finding it to be in dangerous condition. Finally, Wismer did not mention this alleged tour through the garage as a basis for the garage closing during his pretrial deposition testimony. Thus, the jury could reasonably have found the testimony of Brainerd, Liberman, and Wismer to be mere attempts to cover up the Mayor's true motive for closing the garage.
 
 
 57
 A few days later, on the afternoon of December 3, 1990, major City and Parking Authority officials again met with Mayor Goode to discuss the closing of the garage. The meeting took place at the Mayor's office, and present were the Mayor, Managing Director Pingree, the City's highest legal officer, the deputy for the Public Property Department, the Authority's lawyers, Fineman and Bach, and Fitzgerald, the Authority's Executive Director. Again they gave no notice of this meeting to Parkway. The Mayor ordered that the garage be closed. Thus, the strange circumstances leading up to the garage closing also could have lead a reasonable jury to conclude that the Mayor knew of and personally possessed improper motives for closing the garage.
 
 C. Economic Motivation
 
 58
 The foregoing represents ample evidence from which the jury reasonably could have found that the City's purported reason for closing the garage, i.e., that it was in imminent danger of collapse, was pretextual. Moreover, at trial Parkway suggested that the City possessed an improper economic motive for the closing: the City officials, including Mayor Goode and Managing Director Pingree, the two highest policymaking officials, were improperly motivated because the garage had considerably more value to the City if it could relieve itself of the Parkway lease. Parkway asserts in its brief to us that these officials
 
 
 59
 misused the City's safety police, the Department of Licenses & Inspections, to close the Garage on the ground that it was in "imminent danger of collapse" in order to advance the legal and economic position of the Parking Authority and the economic position of the City.
 
 
 60
 To support its theory, Parkway introduced evidence that over the years, the value of the land upon which the garage is situated had increased substantially, as had the income and fees for parking. The First Boston report, dated September 4, 1987, advised the City that Parkway's lease "would limit [the] sale price of the facility." However, Parkway's lease would not expire until 1999.
 
 
 61
 Parkway argues that it was not coincidental that on September 8, 1987, within a few days after receiving the First Boston report, the Authority informed Parkway that it was in default under its lease and unless it commenced work "to correct the faulty condition of the garage by September 10, 1987, ... the Parking Authority will take whatever action it deems fit with respect to the lease agreement, including, without limitation, the termination of your possession of the leased premises." The Authority immediately followed the letter by the first of several actions in the Court of Common Pleas of Philadelphia County to terminate the lease.
 
 
 62
 On December 17, 1990, within two weeks of the summary closure, the Parking Authority's counsel wrote to Parkway's mortgagee, with copy to Parkway, informing it that Parkway had defaulted under its lease for failure to keep the garage in good order and repair, for failure to perform the tests, and for failure to accomplish the repairs identified in the arbitration award made just three days before.[5] In fact, Parkway had determined to perform load tests immediately beginning on December 17, 1990, because, in its view, they would prove, as they did, that the garage was not "in imminent danger of collapse" and because it desired to comply immediately with the arbitrators' directive to perform load testing at six-month intervals.
 
 
 63
 Thus, Parkway submitted evidence to the jury that the defendants' deliberate plan to disengage itself for economic reasons from the Parkway lease was the true motive for the Authority's repeated efforts to default Parkway on its lease and terminate its possession. There was evidence that this also was the motive for the several lawsuits filed by the Authority in September, 1987 and March, 1988, in an attempt to get Parkway to forfeit its lease.
 
 
 64
 Additionally, the jury heard evidence demonstrating the economic identity of interests between the City and the Authority. Deputy City Solicitor Wolf, by internal memorandum to her superior, acknowledged that although the facility was not then in danger of failure, the expense of structural rebuilding could be as much as $4,000,000. She further observed that if Parkway prevailed in its position and the Authority had to bear the expense, "the Parking Authority will try and pass on the cost to the City." The jury also heard evidence that closure by the Department of Public Property (the City) might require it to compensate Parkway for the termination of its lease.
 
 
 65
 Thus, at the risk of some repetition, the evidence that the jury had before it of scienter on the part of the City policy making officials can be summarized as follows:
 
 
 66
 (1) Proof of improper economic motivation[6] to trigger the default provisions of the lease. The jury had before it evidence that within less than a week after receiving the draft report from its financial advisor, First Boston, on the infeasibility of selling the garage subject to the Parkway lease, the Parking Authority, whose economic interests in the garage were identical to those of the City, and whose counsel, Fineman, a close friend and political ally of Mayor Goode, commenced a course of action over the next two years, including a number of unfounded lawsuits,[7] designed to terminate the Parkway lease;
 
 
 67
 (2) proof of an identity of interest between the City and the Authority;
 
 
 68
 (3) proof that no load testing was conducted by the City or the Authority prior to the closing although load testing is the accepted industry barometer by which to measure structural stability;
 
 
 69
 (4) proof that load tests performed by Parkway and independent engineers immediately before and after the closing revealed that the garage could withstand several times the necessary capacity;
 
 
 70
 (5) proof that the supposed bases for the closing are suspect, with Brainerd suggesting that the garage be closed only after a request to that effect by the Mayor; and
 
 
 71
 (6) proof of irregular meetings and contradictory opinions of City and Authority officials regarding the stability of the garage.
 
 
 72
 From all of this evidence the jury could reasonably infer that, as the Mayor of the City, Goode had a major economic interest in the termination of the lease, that he knew of the purport of the First Boston report, that he knew of the unsuccessful lawsuits filed by the Authority, in which the City participated, to forfeit the lease, that he knew that the City had approved Parkway's repairs on the garage pursuant to the October Agreement, and that he knew that the City and BOCA Codes mandated load testing as the sound means of testing the safety of the garage. It thus could have been apparent to the jury that when the Mayor ordered the garage closed at the subsequent meeting of December 3rd, he was not acting in a void, and that his motive for closing the garage was improper.
 
 
 73
 Furthermore, the jury also could reasonably infer improper motivation on the part of the Mayor and Pingree from their acts of omission, as well as commission. These include:
 
 
 74
 (1) Major City and Authority officials were summoned to the Mayor's office on November 19th to discuss the closure of the garage without giving notice to Parkway, a vitally concerned party.
 
 
 75
 (2) The Mayor at this meeting expressed his concern with the shortcomings of Brainerd's letter but said nothing about requiring load testing to determine the safety of the garage.
 
 
 76
 (3) After reading the revised Brainerd letter, the Mayor still gave no notice of it or opportunity to be heard to Parkway. He gave neither notice to Parkway of the meeting on November 30th nor an opportunity to be present.
 
 
 77
 (4) The Mayor required no notice to Parkway of the meeting of December 3rd when he decided to close the garage. He made no inquiry why Parkway's representatives were not present, whether notice had been given to them, and why recent load testing had not been required pursuant to the City Code.
 
 
 78
 (5) In light of the imminence of the arbitration decision due under the Arbitration Rules no later than December 14th, the Mayor made no inquiry, in the absence of load testing, why the decision to close should be made immediately, perhaps thwarting the effect of the forthcoming arbitration award.
 
 
 79
 With the foregoing evidence before it, the trial judge referred the jury to the early December meeting at the Mayor's office and instructed them that the plaintiff "says that was the City acting, that was the final decision, the highest ranking official of the City made this decision. If that is so, it is a final policy of the City on that matter, that is something that is deemed to be conduct by the City."
 
 
 80
 The judge then proceeded to instruct the jury stating:
 
 
 81
 Then, if you find that upon review of all the evidence, that the plaintiff has proven by a preponderance of the evidence that the City of Philadelphia action was without a factual basis, or its action was forwarded by an improper motive, or was made deliberately and intentionally in order to deprive or recklessly deprive the plaintiff of its Constitutional--or its rights to have its properties to itself, then you should find in favor of the plaintiff by saying yes to that first question.
 
 
 82
 After further elaboration, the court instructed the jury that it should decide the purpose behind the closure, and that it should:
 
 
 83
 [P]ut [itself] in the place of the defendants on December 5th and determine at that time what was their motive, what was the information they had, the grounds that they used.
 
 
 84
 None of the defendants objected to these instructions. The jury found for the plaintiff.
 
 
 85
 In sum, Parkway presented ample evidence for the jury to conclude that the City did not close the garage because of its structural instability. Moreover, Parkway presented a plausible alternate theory of the City's motive for the closing that was supported by the evidence. Although much of Parkway's evidence as to scienter on the part of the City's highest policy officials may be circumstantial, such evidence, if examined carefully, is often the best and most reliable proof of the subjective motivations for the conduct of the actors. One can hardly expect them to admit to wrongdoing; circumstantial evidence in cases such as the one at bar usually will suffice. See, e.g., Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 668, 109 S.Ct. 2678, 2686, 105 L.Ed.2d 562 (1989) ("a plaintiff is entitled to prove a defendant's state of mind through circumstantial evidence").
 
 
 86
 Our conclusion is bolstered by our narrow scope of review. On a motion for JNOV, the non-moving party, in this case Parkway, is entitled to the benefit of all reasonable inferences. "The trial judge, in his review of the evidence, and this court, in its own appellate review, must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him every advantage of every fair and reasonable inference." Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir.1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). Moreover:
 
 
 87
 If the [fact finder's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 88
 * * * * * *
 
 
 89
 [Moreover,] when a [fact finder's] finding is based on [its] decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.
 
 
 90
 Anderson v. Bessemer City, 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985); see also Fineman, 980 F.2d at 190 ("We must refrain from passing judgment on credibility issues; our task is to examine the record dispassionately for any evidence from which the jury may have rendered its verdict.").
 
 
 91
 As we stated in Fireman's Fund, "we cannot say (as a matter of law) that the record is deficient of that 'minimum quantum of evidence from which a jury might reasonably afford relief'." 540 F.2d at 1178. On the contrary, we are convinced from our own examination of the record that the plaintiff adduced sufficient evidence to render JNOV improper.
 
 
 92
 The dissent seems to require proof of a smoking gun, chiding the majority because "it does not and cannot point to any evidence that the Mayor talked about terminating the lease for economic gain." (Dissent at p. 705). Pointing to the Brainerd letters, the dissent suggests that these letters, the reports of the City's chief civil engineer Liberman and Deputy Commissioner Wismer, also an engineer, provided the Mayor with sufficient justification for closing the garage, regardless of the jury's disbelief of those witnesses, in the absence of "positive proof that the Mayor acted for improper purposes." Dissent at 706.
 
 
 93
 In the posture of this case on appeal, the plaintiff is entitled to the benefit of all inferences of fact. The Supreme Court in Harte-Hanks, 491 U.S. at 668, 109 S.Ct. at 2686, also made it clear that a plaintiff is entitled to prove a defendant's state of mind through circumstantial evidence. Scienter is not confined to actual knowledge or intentional conduct. See Simmons v. City of Philadelphia, 947 F.2d 1042, 1090 (3d Cir.1991) (Sloviter, C.J., concurring). We are not called upon to demonstrate that there was conclusive proof that the Mayor or the City Manager had an improper motive, but only whether there was sufficient evidence from which the jury reasonably could have found that the policy making officials knew, or were recklessly indifferent to, the relevant facts that disclosed the garage was not in danger of imminent collapse.
 
 
 94
 There may not be conclusive proof that the Mayor or Pingree ignored the load test for an improper reason, but there is sufficient evidence from which the jury could so find. The jury heard considerable testimony that load testing is the proper method for determining the structural stability of the garage. Brainerd himself so testified at the arbitration hearings, other experts agreed, and the City Code so provides. As for the Brainerd letters, the Mayor found the first Brainerd letter inadequate, and justifiably so, because it speaks of deterioration in hypothetical terms--"to the extent that it is possible there are areas of slabs that would not pass a load test...." The circumstances under which the second letter was solicited made it suspect. The jury could reasonably have found it pretextual, including the additional paragraph added to satisfy the Mayor. Furthermore, the second letter was not based on any further investigation or inspection of the garage since Brainerd wrote the first letter. As already noted, Dr. Sozen, Chairman of the American Concrete Institute, testified in this case that if there is controversy, "the [load] test is used on the assumption that one test is worth a thousand opinions." Given the overwhelming evidence, including both the City and National Code, that load testing is the proper method to test structural stability, the jury's determination that the Mayor's decision not to require a load test to close the garage, without prior notice to Parkway and an opportunity to be heard, and to terminate a no longer desirable contract was improperly motivated is supported by sufficient evidence.
 
 
 95
 That the City had an economic motive to terminate the lease is unchallenged. At the very least, proof of economic motive provides a reasonable inference, when combined with the other evidence. The irregular procedures, the closing despite Parkway's recent completion of City approved repairs, the failure to notify Parkway of critical meetings concerning the closing, and other relevant evidence provided the jury with a basis from which it could reasonably find that the Mayor acted knowingly or with reckless indifference.
 
 D. The Parking Authority's Motion for JNOV
 The district court stated:
 
 96
 Parkway's theory of liability as to the Authority was that the Authority conspired with the City under Sec. 1983 to violate Parkway's substantive due process rights. This court's conclusion that the evidence does not support the Sec. 1983 verdict against the City necessitates setting aside the judgment entered against the Authority as well.
 
 
 97
 To demonstrate a conspiracy under Sec. 1983, a plaintiff must show that two or more conspirators reached an agreement to deprive him or her of a constitutional right "under color of law." Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). The Authority argues that because the City did not deprive Parkway of its constitutional rights, the Authority could not have conspired with the City to do so, and thus both JNOVs were proper. The Authority's argument is wide of the mark.
 
 
 98
 As discussed in section II, supra, there was ample evidence for the jury to conclude that the City decided to close the garage for improper reasons in violation of Parkway's constitutional rights. Therefore, the Authority's contention that there was no constitutional violation of Parkway's rights must fail.
 
 
 99
 Moreover, there was ample evidence adduced at trial that the Authority possessed the same economic motivation to close the garage as did the City and that it was deeply involved in the decision making process. For example, present at the December 3rd meeting at which the Mayor decided to close the garage were David Fineman and Mitchell Bach, attorneys for the Authority, and Webster Fitzgerald, Executive director of the Authority. Moreover, it was Fineman who undertook to have Brainerd revise his November 1st letter so as to satisfy the Mayor in arriving at a decision to close the garage. These men were instrumental in advising the Mayor both in his decision to close the garage, and in the means by which he carried out the closing. Therefore, it was error to grant the Authority's motion for JNOV.
 
 III.
 
 100
 The district court awarded the Authority $241,933.66 in pre-arbitration expenses and costs and $51,410.45 for post-arbitration expenses and costs. The district court based its ruling on paragraph 24 of the Parkway lease, which provides:
 
 
 101
 [T]enant agrees to pay ... any and all damages, costs and expenses which Authority may suffer or incur by reason of ... failure on [tenant's] part to comply with any of the terms, conditions or covenants [of the lease].
 
 
 102
 However, paragraph 24 covers only costs that the Authority incurs in an attempt to gain compliance with the lease. In this case, Parkway initially conceded that it was obliged and willing to repair the garage. The Authority insisted, however, that Parkway totally rebuild the garage. Parkway offered even to comply with this demand in exchange for an extension of the lease, which the Authority summarily rejected.
 
 
 103
 The arbitration panel ordered Parkway to make ordinary repairs to the garage, but it did not order rebuilding. Therefore, the panel essentially accepted Parkway's position that Parkway was obligated to repair but not rebuild the garage. Thus, arbitration was unnecessary to gain Parkway's compliance with the lease, as interpreted by the arbitration panel; rather, it was the Authority's erroneous, or perhaps pretextual, position that created the need for arbitration. Thus, paragraph 24 does not justify taxing the costs of arbitration to Parkway.
 
 
 104
 It also seems incongruous to allow the Authority to file suit in a court of law seeking arbitration costs. One of the common purposes of arbitration agreements is to avoid the costly and time consuming experience of courtroom litigation. Thus, after arbitration has been concluded, allowing the Authority to force Parkway into a court of law to relitigate the issues of the case under the auspices of assessing the costs of arbitration essentially eviscerates the beneficial purposes of arbitration and multiplies the litigation process, including time and expense. Rather, the Authority should have sought costs during the arbitration itself, not in subsequent courtroom litigation. After all, the arbitrators are in the best position to allocate the arbitration expenses.
 
 
 105
 In sum, the arbitration panel's decision reflects Parkway's original position, i.e., that it was required to repair but not rebuild the garage. Thus, the parties engaged in arbitration, not because Parkway would not comply with the lease, but because the Authority sought to forfeit Parkway's interest in the lease. Therefore, it was error to assess the costs of arbitration to Parkway.
 
 IV.
 
 106
 The issue of whether the lease between the Authority and Parkway implies a covenant of good faith is a question of state law. We review the district court's prediction of state law under a plenary standard. Compagnie des Bauxites de Guinee v. Insurance Co. of N. Am., 724 F.2d 369, 371 (3d Cir.1983). Federal courts that decide state law claims "are required to apply the substantive law of the state whose laws govern the action." Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir.1990) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). We therefore turn to the substantive law of Pennsylvania to evaluate the propriety of the district court's decision on this issue.
 
 
 107
 The jury below found that there is an implied covenant of good faith and fair dealing in the lease between the Authority and Parkway. Moreover, the jury found that the Authority's actions regarding the closing of the garage constituted a breach of that covenant of good faith. The Authority, through its counterclaim, urges this court to nullify the jury's verdict because Pennsylvania law does not recognize such an implied covenant in cases such as the one at bar. As discussed below, we believe the Authority is correct.
 
 
 108
 The Restatement (Second) of Contracts section 205 (1982) provides:
 
 
 109
 Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.
 
 Moreover:
 
 110
 The law is clear that "In the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract. Accordingly, a promise to do an act necessary to carry out the contract must be implied."
 
 
 111
 Daniel B. Van Campen Corp. v. Building and Constr. Trades Council, 202 Pa.Super. 118, 122, 195 A.2d 134, 136-37 (1963) (citation omitted).
 
 
 112
 However, the Superior Court of Pennsylvania has stated:
 
 
 113
 In this Commonwealth the duty of good faith has been recognized in limited situations. Most notably, a duty of good faith has been imposed upon franchisors in their dealings with franchisees.
 
 
 114
 * * * * * *
 
 
 115
 Conversely, the Supreme Court of Pennsylvania has refused to impose a duty of good faith that would modify or defeat the legal rights of a creditor.
 
 
 116
 Creeger Brick & Building Supply Inc. v. Mid-State Bank & Trust Co., 385 Pa.Super. 30, 33-36, 560 A.2d 151, 153-54 (1989).
 
 
 117
 Thus, under Pennsylvania law, every contract does not imply a duty of good faith. In Creeger, the court held that, because other causes of action existed where the plaintiff could seek relief, "[t]here is no need in such cases to create a separate tort for breach of a duty of good faith." Id. 560 A.2d at 154. Similarly, in the case sub judice, Parkway's allegations concerning the closing of the garage in bad faith are identical to its allegations under Sec. 1983. Therefore, like the plaintiff in Creeger, Parkway could seek relief under an established cause of action, and there is thus no reason to imply a separate tort for breach of a duty of good faith. See also D'Ambrosio v. Pennsylvania Nat'l Mut. Casualty Ins. Co., 494 Pa. 501, 507-08, 431 A.2d 966, 970 (1981) (The court refused to recognize separate cause of action for breach of good faith where adequate remedy was provided under Unfair Insurance Practices Act.); Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc., 344 Pa.Super. 367, 373, 496 A.2d 840, 843 (1985) (The court would not create a tort remedy where there was an adequate remedy to address the claims in existing torts and contracts law.).[8]
 
 
 118
 Therefore, we predict that the Pennsylvania Supreme Court would not extend the limited duty of good faith to a situation such as the one at bar in which there already exists an adequate remedy at law. See Coxfam, Inc. v. AAMCO Transmissions, No. 88-6505, 1990 WL 131064, * 5 (E.D.Pa.1990) (refusing to extend the duty of good faith absent Pennsylvania authority to do so). Thus, the jury award of $1,000,000 to Parkway for breach of the duty of good faith will be reversed.
 
 V.
 
 119
 In sum, we will reverse the judgment of the district court. First, Parkway presented sufficient evidence at trial from which the jury could reasonably find that Mayor Goode and Managing Director Pingree had conspired with the Authority to close the garage for improper reasons. Consequently, the district court erred in setting aside the jury verdict in favor of Parkway and granting the motion for JNOV.
 
 
 120
 Second, it was error to have taxed Parkway with the costs of arbitration. The arbitration was not necessary to gain Parkway's compliance with the lease, as Parkway had already conceded the obligations eventually imposed upon it by the panel. Rather, it was only the Authority's plan to accelerate the termination of the lease and regain possession that induced the need for arbitration. Thus, paragraph 24 does not justify assessing the costs of the arbitration to Parkway. Furthermore, allowing the Authority to seek arbitration costs in a separate court proceeding would strip Parkway of the benefits of arbitration and force it to relitigate the issue in court, rather than in the arbitral forum which heard the arbitration proceedings in the first place.
 
 
 121
 Finally, the jury verdict on the implied covenant of good faith will also be reversed. We predict that the Pennsylvania Supreme Court would not imply such a duty when the plaintiff has pursued other avenues that encompass this relief. In this case, Parkway pursued a Sec. 1983 claim for the alleged constitutional violation; thus, there would be no need for a Pennsylvania court to imply a covenant of good faith and fair dealing.
 
 
 122
 Accordingly, the judgment of the district court will be reversed. The case will be remanded to the district court with directions to reinstate the verdict in favor of Parkway Garage, Inc., and against the City of Philadelphia and the Philadelphia Parking Authority in the sum of five million dollars.
 
 
 123
 The district court denied the motions of the City and the Authority for new trial pursuant to Fed.R.Civ.P. 59 and did not act on the Alternative Motion for Remittitur. Fed.R.Civ.P. 50(c) provides that if the renewed motion for judgment as a matter of law is granted, the court's ruling on the motion for new trial "shall specify the grounds for granting or denying the motion for new trial." The district court, however, failed to specify any grounds for the denial. Accordingly, upon remand, the district court will also dispose of the motions for new trial as provided by Rule 50(c), enter an appropriate order on the Alternative Motion for Remittitur, and take such further action as is consistent with this opinion.
 
 
 124
 Each side to bear its own costs.
 
 
 125
 GREENBERG, Circuit Judge, concurring in part and dissenting in part.
 
 
 126
 I respectfully dissent. The majority states that the issue is whether Mayor Goode "knew or recklessly disregarded the relevant facts that disclosed that the garage was not in imminent danger of collapse when he summarily decided to close it on December , 1990."[1] Majority at 692-93. The majority, of course, recognizes that in this action under 42 U.S.C. Sec. 1983 respondeat superior is inapplicable and I agree with that statement of the law. See Monell v. Department of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978); Simmons v. City of Philadelphia, 947 F.2d 1042, 1063 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992). I part company, however, with the majority because in my view the evidence cannot support a conclusion that the Mayor knew or recklessly disregarded facts showing that the garage was not in imminent danger of collapse on December 3, 1990. Indeed, on the basis of the information available to the Mayor he might have acted recklessly if he had not closed the garage. At the outset I shall tell the reader who supplied testimony that the Mayor acted other than to forestall what appeared to him to be a looming disaster: nobody. I also shall tell the reader what the testimony was that the Mayor had information that the garage was not in imminent danger of collapse: none. Thus, despite its acknowledgement that respondeat superior is inapplicable, the effect of the majority's opinion is to impose liability on the city on the basis of that legal doctrine.
 
 
 127
 The district court in granting the city judgment on the section 1983 claim found that Parkway failed to produce any evidence demonstrating that the Mayor closed the garage for reasons other than his concern for its safety. Furthermore, the district court indicated that there was no evidence showing that he acted to benefit the Parking Authority's economic status:
 
 
 128
 Nowhere in the record is there any evidence that Mayor Goode ... deliberately acted to violate Parkway's civil rights. Rather, the evidence shows only that Mayor Goode, faced with reports submitted by a reputable engineer expressing concern over the safety of the garage, made a decision to close the facility.
 
 
 129
 The district court noted further that the evidence only showed:
 
 
 130
 that Goode ... met with various individuals to discuss the engineering reports regarding the garage's structural soundness, the overall safety of the facility, and the option of closing the garage. Even if the jury found that some individuals at the meeting misrepresented the condition of the garage or themselves had improper motives for requesting that the garage be closed, the jury could not have found, based on the evidence, that Mayor Goode [was] aware of these misrepresentations or improper motives or that [he] recklessly disregarded any indication of impropriety in the requests to close the garage.
 
 
 131
 In its opinion, the district court thus demonstrated that it fully understood that the critical issue was the Mayor's scienter. The majority, of course, states the issue in the same way. Thus, I will describe what the record shows with respect to the information available to the Mayor.
 
 
 132
 On November 1, 1990, Michael Brainerd, the Parking Authority's expert engineer, submitted an engineering report to S. David Fineman, the Authority's counsel, stating that the slabs in the garage were so deteriorated that it was impossible to demonstrate and to assure continued structural safety through engineering calculations or load reports. Significantly, Brainerd's report repeatedly warned that load tests would be undependable. For example, it stated: "The parking deck slabs have deteriorated to the extent that it is not possible to reliably demonstrate and continually assure their structural safety by periodic inspections and practical load tests." The report also warned that "the degree of loss of bond between the reinforcement and the concrete cannot be determined by inspection methods that do not involve significant demolition" and that "[l]oad tests of slabs with severe and widespread corrosion damage ... can produce misleading and dangerous results since they may add further progressive reduction of shear strength without actually producing excessive inelastic deformation or collapse during the test." Brainerd's report also indicated that there was probably a "significant reduction in the slab shear strength" and that "[s]hear failure can occur suddenly and without warning." Brainerd's report, however, did not state expressly whether the garage was in danger of imminent collapse or whether it should be closed immediately. On November 5, 1990, Fineman forwarded the report to Salley Bellet, an attorney in the City Solicitor's office.
 
 
 133
 On November 18, 1990, the Mayor called a meeting in his office to discuss the implications of Brainerd's report. Fineman, L & I Commissioner Kligerman, and Bellet attended the meeting. The testimony indicates that at that meeting the Mayor said that if Brainerd thought that the garage should be closed he should state so in writing expressly. Subsequently, on November 27, 1990, Brainerd rendered another report which reiterated his November 1, 1990 findings but, in addition, recommended that the garage either should be closed or temporarily shored since "the extent of present deterioration of the suspended parking deck slabs is cause for major concern regarding their safety and since their safety can no longer be reliably demonstrated or continually assured."
 
 
 134
 After reading Brainerd's first report, Michael Liberman, the City's chief civil engineer, conducted his own examination and submitted his own report dated November 20, 1990, stating that the garage was unsafe. Liberman said that his inspection showed that there was delamination or recent repairs around every column on level 1 and that there were cracks through many of the repairs. According to Liberman, the cracks confirmed that Parkway's repairs were "only cosmetic in nature and they are not holding." Liberman warned that the deck slabs may be "legally unsafe" because the "delamination threatens the shear strength of the slabs. Failure in shear results in a sudden, catastrophic collapse with no prior warning, e.g. from sagging." Liberman concluded that "to attempt to squeeze every last month out of a failing structure is, at this point, irresponsible." Accordingly, he recommended that "considering the possible consequences ... the garage [should] be closed immediately and abandoned or reconstructed." David Wismer, the L & I deputy Commissioner, who was also an engineer, became aware of the Liberman memorandum. On December 3, 1990, Wismer and Liberman conducted a walk-through inspection of the garage at which they concluded that deterioration was occurring at an ever-increasing rate.
 
 
 135
 On December 3, 1990, the Mayor called another meeting at City Hall. The Mayor, the Managing Director, Kligerman, Wismer, Public Property Commissioner Andres Perez, Bellet, Fineman, and other officials attended the meeting. According to the testimony of all the witnesses who participated at this meeting, the Mayor asked Kligerman and Perez whether the garage should be closed and they said yes. The testimony also indicates that no one in the room challenged this recommendation. Accordingly, the Mayor decided to close the garage, and then left the meeting, delegating to the City Managing Director the decision as to which agency should implement the closing. Kligerman then correctly predicted that Parkway would appeal the closing.
 
 
 136
 I would find it understandable if at this point a reader of this dissent wondered what the Mayor did that recklessly or intentionally disregarded facts actually known to him that the garage was not in danger of imminent collapse. After all he had engineering reports that load testing was not reliable and that there could be a sudden, catastrophic collapse of the garage and that it should be closed immediately. Furthermore, the reports explained the reasons why their engineer writers reached their conclusions. Faced with the choice on the basis of the information presented to him between risking lives and forcing motorists to find alternative places to park, was the Mayor reckless in refusing to place lives at risk?
 
 
 137
 Why then does the court reverse the judgment of the district court in favor of the City? The first reason is that "the Mayor had the garage closed on December 4 without conducting any load tests." Majority at 693. In this regard the majority points out that load testing is the procedure to determine safety, the City had used it before, and Brainerd had testified at the arbitration hearing that load testing was the only way to determine if a structure is unsafe.
 
 
 138
 The problem with this analysis is that Brainerd's reports indicated that load testing was not reliable in the circumstances then existing at the garage. Of course, there was no evidence that the Mayor was aware of Brainerd's testimony at the arbitration hearing. More importantly Brainerd's testimony at the arbitration hearing had been superseded by his reports predicated on a later inspection. Can we really hold that the jury may fairly have concluded that the Mayor was reckless or acted intentionally wrongfully by disregarding facts known to him on the basis of his refusal to order tests that the engineering expert said were unreliable? The majority also points out that after the closing, load tests proved the garage to be safe. What the majority cannot explain, however, is how these tests possibly could have impacted on the Mayor's earlier decision to close the garage.
 
 
 139
 Next, the majority points out that Parkway had less than three weeks before December 3, 1990, properly completed repairs to the garage required by the city. While I do not dispute that statement, I fail to see why the completed repairs have any bearing at all on the question of whether the Mayor was reckless or acted intentionally wrongfully on December 3, 1990, when he made his decision on the basis of the opinions rendered by professionals. Liberman's report was that the repairs were only cosmetic and were not holding and thus even if they had been completed properly, the Mayor's information was that the safety problem remained.
 
 
 140
 The majority also correctly points out that "Fineman testified at trial that in the course of the discussion [on November 18, 1990], the Mayor said that he had read Brainerd's letter of November 1, and that if Brainerd believes the garage should be closed, he ought to put that in a letter." Majority at 694. This statement generated Brainerd's next report of November 27, 1990, which flatly stated the garage should be closed. The majority then indicates that Brainerd wrote the second report without conducting any further tests. From this the majority concluded that:
 
 
 141
 Thus, it was reasonable for the jury in this case to conclude that Brainerd's revised letter that suggested that the garage be closed was really a response to the Mayor's request to find a way to terminate Parkway's lease in order to realize economic gain for the City and the Authority.
 
 
 142
 Majority at 694.
 
 
 143
 The foregoing conclusion is central to the majority's analysis inasmuch as Brainerd's second report said the garage should be closed. However, I am at a total loss to understand how the majority reaches its conclusion as there is no basis for it in the record. The majority does not and cannot point to any evidence that the Mayor talked about terminating the lease for economic gain. I cannot join in an opinion saying that the mayor made a request to terminate the lease for that reason when there is no evidence that he did so. The suggestion that the Mayor requested a way to terminate the lease for economic reasons is a pure litigation construct advanced by Parkway.
 
 
 144
 In fact, the record is absolutely clear as to what happened. In Brainerd's report of November 1, 1990, he pointed out that the garage was in a deteriorated condition, but he did not say one way or the other if it was in danger of imminent collapse nor did he say it should be closed. On November 18, 1990, the Mayor said he would not act on the basis of Brainerd's November 1, 1990 report, and if Brainerd believed the garage should be closed he should say so in writing. That, of course, is what Brainerd then did. It is simply not possible to draw an inference from these events that what the Mayor said should be done was to terminate the lease to benefit the City's and authority's fiscs.
 
 
 145
 The majority next acknowledges that Liberman's report of November 20, 1990, indicated that the garage should be "closed immediately and abandoned or reconstructed." But the majority dismisses Liberman's report on the ground that it "did not state that the garage was in imminent danger of collapse." Majority at 695. All I can say about this is that the report, after describing the conditions in the garage, indicated that they could lead to "a sudden, catastrophic collapse with no prior warning." While I suppose that it can be argued that Liberman did not flat out say that there would be a collapse, surely the Mayor cannot be faulted for acting on such a report. After all Liberman described the conditions and said what they could lead to. In any event, Liberman's report surely cannot be understood as suggesting that the garage was not in imminent danger of collapse. The majority also indicates that Liberman, in fact, did not believe the garage was in imminent danger of collapse but the majority acknowledges Liberman did not express this opinion to the mayor.
 
 
 146
 Finally, in its analysis of the scienter evidence the majority indicates that "the jury could reasonably have found the testimony of Brainerd, Liberman, and Wismer to be mere attempts to cover up the Mayor's true motive for closing the garage" and that "the strange circumstances," including the fact that the garage was ordered closed without prior notice, "leading up to the garage closing also could have lead a reasonable jury to conclude that the Mayor knew of and personally possessed improper motives for closing the garage." Majority at 695. I simply cannot accept these conclusions. While I agree that it would have been better for the Mayor to discuss the matter with Parkway before the closing the garage, it is not true that there were "strange circumstances" leading to the closing. There was nothing strange about what happened. The Mayor received engineering reports that indicated the strong possibility that the City was confronting a catastrophe. He insisted that they be detailed and that Brainerd be clear as to what he meant. He discussed the matter with his top officials. He then acted to forestall what was presented to him as a disaster waiting to happen.
 
 
 147
 Furthermore, the problem with the observation that the testimony could be a cover-up is that there is not even a scintilla of evidence that the Mayor acted for any reason other than to counter the threat to public safety. In addition, no matter what the jury may have thought of these witnesses it could not have concluded that the Mayor did not have the written reports on which he acted. I also point out that even if the jury disregarded the witnesses' testimony, its mere disbelief of these witnesses could not be a substitute for positive proof that the Mayor acted for improper motives. See Tose v. First Pennsylvania Bank, 648 F.2d 879, 894 (3d Cir.), cert. denied, 454 U.S. 893, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).
 
 
 148
 I am disturbed particularly by the suggestion that the evidence supported a conclusion that the Mayor closed the garage for "improper motives." There is no point in pretending that the majority's opinion means something other than what it says. By suggesting that Mayor Goode "possessed improper motives for closing the garage," the majority says he was dishonest. Yet the majority does not point to a single witness whose testimony, whether directly or by supplying a basis for an inference, can support a conclusion that the Mayor acted for any reason other than to protect the public interest.
 
 
 149
 The majority goes on to explain that the Mayor's improper motive was to terminate Parkway's lease because the property would be worth more money without it. While the record does support a conclusion that with Parkway gone the City's economic position would be enhanced, that circumstance proves nothing. Surely the City in exercising its police powers cannot be charged with violating Parkway's constitutional rights simply because the exercise has the incidental consequence of enhancing its proprietary economic position. In short, absent some basis to tie conduct to motive, a reasonable trier of fact cannot draw an inference of intent predicated on that motive. Here the evidence was that the Mayor acted for one reason and one reason only, the public safety. In this regard I cannot emphasize too strongly that we are concerned only with the Mayor's scienter. Whatever motivated other persons, whether they were honest or dishonest, devious or upright, there is no evidence to support a conclusion that the Mayor, when he ordered the garage closed, acted other than to protect the public safety. I also emphasize again that this is not a respondeat superior case.
 
 
 150
 Finally, notwithstanding the fact that the City may have been better off without Parkway as a tenant in the garage, if we are to consider motive we at least should focus on the particular matter before us. An inquiry into the City's motives should ask whether it was in the City's economic interest to order the garage closed on December 3, 1990, or, to be more precise, whether a jury reasonably could have drawn an inference that the Mayor may have thought on December 3, 1990, that his actions in closing the garage could have been in the City's economic interest. The answer to this question is surely "no." The only way that it could be inferred that the Mayor would have thought that closing the garage would have been in the City's economic interest would have been if he could have anticipated that Parkway would have accepted the order and surrendered its lease without an administrative and court fight. Otherwise the Mayor had to recognize that the closing would have to be justified before an independent tribunal on the merits.
 
 
 151
 Yet it is perfectly obvious that the history of the disputes between Parkway on the one hand, and the City and the Philadelphia Parking Authority on the other, demonstrated on December 3, 1990, that Parkway would not accept docilely the closing order. As the majority points out, there had already been three court actions and an arbitration regarding the lease. In the circumstances, it would have been totally unreasonable for a jury to infer that the Mayor could have believed that he would have aided the City financially by closing the garage. I reiterate, however, that even if that inference could have been drawn, the City nevertheless was entitled to a judgment as a matter of law because there is no basis in the record to conclude that the Mayor acted for economic motives.
 
 
 152
 In concluding my dissent I add one further point. The implications of this opinion are enormous. To start with, of course, the opinion will cost the City millions of dollars. But the problem goes beyond that. In the future, public officials faced with information that lives are at risk may believe quite reasonably that if they act on the information they may expose the entity they represent as well as themselves to liability under 42 U.S.C. Sec. 1983. Such officials may hesitate when they should act and this may lead to catastrophic consequences. It is obviously no answer to suggest that officials need not be apprehensive if they are honest. If the City can be liable here then who can assure an official whose action seems appropriate at the time that he or she will not in retrospect be viewed as having been reckless or dishonest? After all, as I said at the outset, there was no evidence that the Mayor knew or recklessly disregarded relevant facts that demonstrated that the garage was not in imminent danger of collapse when he ordered it closed.
 
 
 153
 My conclusions lead me to dissent from so much of the majority opinion which denies a judgment as a matter of law to the city and the parking authority on the claims under 42 U.S.C. Sec. 1983. However, I agree with the majority with respect to the arbitration costs and the implied covenant of good faith so I join in the balance of its opinion.
 
 SUR PETITION FOR REHEARING EN BANC
 
 154
 Dec. 17, 1993.
 
 
 155
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and LEWIS, Circuit Judges, and ROSENN, Senior Judge.*
 
 
 156
 The petition for rehearing filed by appellees, City of Philadelphia and Philadelphia Parking Authority, in the above-entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing en banc, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing en banc is denied.
 
 
 157
 Chief Judge Sloviter and Judge Roth would grant rehearing in banc. Judge Greenberg would grant rehearing for the reasons set forth in his dissent.
 
 
 
 [1]
 Effective December 1, 1991, Fed.R.Civ. P. 50 was amended to abandon the terminology "direction of verdict" and "judgment notwithstanding the verdict" and its latin counterpart "judgment non obstante veredicto" (JNOV). The amended rule substitutes the terminology "judgment as a matter of law," a term that also appears in Rule 56(c). In this case, however, the district court used the former, traditional terminology. Thus, for ease of understanding the trial court proceedings and its opinion in this case, we also utilize the original nomenclature
 
 
 [2]
 The district court properly exercised federal question jurisdiction over this Sec. 1983 civil rights claim pursuant to 28 U.S.C.A. Sec. 1331 (West 1966 & Supp.1993). The district court also had supplemental jurisdiction for the pendent state claim on the implied covenant of good faith under 28 U.S.C.A. Sec. 1367 (West Supp.1993)
 Because all orders of the district court in this case are final, this court has appellate jurisdiction pursuant to 28 U.S.C.A. Sec. 1291 (West 1966 & Supp.1993).
 
 
 [3]
 Recklessness has been defined as conduct or state of mind that "either pays no regard to its probably or possibly injurious consequences, or which, through foreseeing such consequences, persists in spite of such knowledge." Simmons v. City of Philadelphia, 947 F.2d at 1090 (Sloviter, C.J., concurring) quoting from Black's Law Dictionary 1142-43 (5th ed. 1979). "Failure of a municipality to fulfill a duty to guard against a foreseeable harm when its officials have knowledge of circumstances making that harm likely is clearly reckless and culpable conduct." Simmons, 947 F.2d at 1090
 
 
 [4]
 However, on that same day, November 19th, Bach, Fineman's partner, informed the arbitrators that Parkway's engineers had advised him that the garage was not in danger of imminent collapse
 
 
 [5]
 The arbitration panel announced its award on Friday, December 14, 1990. Counsel for the Authority wrote the letter of default to the mortgagee, Equitable Life Assurance Society, on Monday, December 17th, thus leaving only the weekend for Parkway to comply with the repairs before it wrote the mortgagee
 
 
 [6]
 The dissent expresses distress by the majority's suggestion that the evidence supported a conclusion that the Mayor closed the garage for an improper motive. This, the dissent concludes, is tantamount to a statement by "the majority [which] says he was dishonest." We see nothing in our opinion on which such a conclusion can be predicated. This court has said "whether a city has acted with an improper motive" is a factual question, Midnight Sessions, Ltd. v. City of Philadelphia, 945 F.2d 667, 683 (3d Cir.1991). We gave examples of improper motivation as "political motivation or racial animus," id. at 683, to which we now add in the circumstances of this case, economic motivation. Economic motivation may be, and often is, a laudable justification for human behavior, but not under the circumstances of this case. It was for the jury to determine the motivation of the City's action. Although we believe that there is sufficient evidence from which the jury reasonably could have found the Mayor and the City were improperly motivated, neither Parkway nor the majority characterize such action as dishonesty
 
 
 [7]
 The City's Board of License and Inspection Review sustained Parkway's appeal from the garage closing on December 4, 1990. The City appealed the decision of the Review Board to the Philadelphia Court of Common Pleas on January 9, 1991. The Court of Common Pleas issued its decision and order on February 15, 1991, ordering the garage closed on February 16, 1991. Parkway petitioned the Commonwealth Court of Pennsylvania for stay pending appeal and summary reversal of the Common Pleas' decision. The Commonwealth Court granted the stay and expedited the appeal. In reversing the Court of Common Pleas and reinstating the decision and order of the Board of License and Inspection Review, the Commonwealth Court observed:
 Our thorough review of the record indicates the following chronology of events. The Parking Authority first lost in the Court of Common Pleas because of the binding arbitration clause within a lease authored by the Parking Authority. Following extensive, non-appealable arbitration proceedings, Parkway again prevailed. Having been rebuffed in both these attempts to regain possession of the garage, the City, Parkway's assignor, then condemned the garage because of an alleged safety hazard. Exhaustive hearings before the Review Board whose members were appointed by the Mayor pursuant to the Home Rule Charter, were held and the City again failed to prevail. Subsequent to this, an ex parte motion was filed before Common Pleas which, despite an apparent lack of de novo jurisdiction, reversed the Review Board and substituted its own factual findings.
 Philadelphia v. Board of License, 139 Pa.Cmwlth. 240, 249, 590 A.2d 79, 84 (1991).
 
 
 [8]
 Because we predict that Pennsylvania would not imply a separate duty of good faith in an action which already subsumes it, there is no need to discuss the propriety of the amount of the jury award for the breach
 
 
 [1]
 The majority indicates that the issue also includes the question of whether Managing Director Pingree acted knowingly or recklessly but inasmuch as the majority's analysis focuses on the Mayor alone and the Mayor ordered the closing I will approach the case in the same way. I use the date of December 3, 1990, as the Mayor ordered the closing that day, though the actual closing was the following day
 
 
 *
 Judge Rosenn voted only on panel rehearing