ADAMS PARKING GARAGE, INC.,
Scranton Life Realty Company and
Anthony J. Rinaldi, Plaintiffs,

v.

CITY OF SCRANTON, Honorable
James Connors, Individually and as
Mayor of the City of Scranton and
Members of the City Council, Honor-
able Edward Walsh, Honorable Brian
Reap, Honorable Christopher Doherty,
Honorable John Pocius, Honorable
Alex Hazzouri, Parnell Joyce, Boyd
Hughes, Scranton Redevelopment Au-
thority, Defendants.

No. 3:99–CV–1212.

United States District Court,
M.D. Pennsylvania.

April 26, 2001.

Robert J. Sugarman, Sugarman & Associates, Philadelphia, PA, for plaintiffs.

David E. Heisler, Lenahan & Dempsey, Scranton, PA, for defendants.

David E. Heisler, Lenahan & Dempsey, Scranton, PA, Jeffrey B. McCarron, Gregory S. Skibitsky, Anthony T. Febbo,

Swartz, Campbell & Detweiler, Philadelphia, PA, for Boyd Hughes.

## MEMORANDUM

CAPUTO, District Judge.

Plaintiffs brought the present § 1983 action on July 9, 1999, alleging that Defendants deprived them of their constitutionally protected rights by conspiring to terminate Plaintiffs' lease of a parking garage owned by the City of Scranton ("the city"). The second amended complaint contains substantive and procedural due process claims, an equal protection claim, and a claim for breach of contract under Pennsylvania law. (Doc. 45.) On December 7, 1999, this court denied the motion to dismiss of Defendant Boyd Hughes, holding that Plaintiffs had properly alleged that Hughes had participated in the wrongdoing and that he had acted under color of state law. (Memorandum and Order, Doc. 33.) Hughes subsequently moved for summary judgment on all four of Plaintiffs' claims, a motion which the other defendants then incorporated into their own motion for summary judgment. (Docs.51, 57.) [1] Because the court concludes that Defendants' termination of the lease was not a breach of contract and thus not a violation of due process, and because Plaintiffs have failed to produce sufficient evidence of arbitrarily disparate treatment by the governmental defendants, Defendants' motion for summary judgment will be granted.

## I. Factual and Procedural History

Plaintiff Anthony Rinaldi is the sole shareholder of Scranton Life Realty Company ("Scranton Life"), which has offices in Scranton, Pennsylvania. (Defendants' Statement of Material Facts, Doc. 64 ¶ 2.) On September 11, 1989, Scranton Life sold certain properties to the city in lieu of condemnation, namely, a multi-story commercial and parking garage building located on Adams Avenue and a three story commercial building located on Lackawanna Avenue. (See Agreement of Sale, Document 69, Exhibit J ¶ 1.) Paragraph four of the sale agreement states that "[t]he purchase price is $1,350,000 (the 'Purchase Price')." (Id.¶ 4.) The following paragraph of the agreement requires the city, upon purchasing the property, to lease the parking garage building to Adams Parking, Inc., an entity wholly owned by Rinaldi, "for a term of five (5) years with five (5) five (5) year options, at first year rent [sic] $3,850.00 per month, on the condition that [the building] continue to be operated as a public parking garage." (Id.¶ 5.) Rent increases were tied to increases in the consumer price index. (Id.)

The parties executed the parking garage lease agreement on the same day they signed the sale agreement. (See Lease, Doc. 69, Exhibit C.) Contained in the lease agreement is a provision allowing either party to terminate the lease should the parking garage be condemned by "any governmental authority." (Id.¶ 13.) For nine years, Adams Parking operated the garage pursuant to the terms of the parties' sale and leaseback arrangement. During that period, however, city officials were engaged in consultations with developers and officials at the Scranton Redevelopment Authority ("SRA") regarding the development of a blighted area of the city that included the parking garage. (See Tr. of Proceedings Before the Court of Common Pleas of Lackawanna County, Doc. 69, Exhibit P.) On October 2, 1998, the SRA, determining that the area was in fact blighted, condemned the parking garage property and took ownership from

---

1. Because the two motions are largely identical, the court will hereafter refer to them collectively as "Defendants' motion for summary judgment."

**420**

the city. (See Declaration of Taking, Doc. 53, Exhibit A.) Shortly thereafter, on December 9, 1998, the city exercised its right to terminate its lease with Adams Parking due to the fact that a governmental authority had condemned the premises and taken title. (See Letter Notice of Termination, Doc. 69, Exhibit O.)

Adams Parking challenged the condemnation in state court. The Court of Common Pleas of Lackawanna County upheld the condemnation, rejecting Plaintiffs' contention that the SRA's determination of blight was made arbitrarily and capriciously and in bad faith. (Opinion and Order of June 22, 1999, Doc. 53, Exhibit D at 19.) On appeal, the Commonwealth Court affirmed the trial court, stating:

> A review of the record as a whole including the extensive testimony describing the blight determination and the Garage's condition, supports the finding that the Authority acted in conformance with the law and not in bad faith or in an arbitrary and capricious manner. The Court notes also that the lease between the City and Appellant contained a termination clause, which became operative once the Authority acquired title to the condemned property.

(December 15, 1999 Memorandum Opinion, Doc. 53, Exhibit E at 6.)

The instant suit was filed by Plaintiffs in July of 1999, after the decision of the Court of Common Pleas but prior to the Commonwealth Court's affirmance. Plaintiffs allege that Defendants conspired to deprive them of their property interests in the parking garage for various personal, political and economic reasons. (See Doc. 45 ¶¶ 26–45.) For example, Plaintiffs' claim that the personal animosity of SRA attorney Boyd Hughes was revealed when he allegedly said "F --- Tony Rinaldi" to Defendant Parnell Joyce, Director of the Scranton Office of Economic and Commu-

nity Development. (See Rinaldi Aff., Doc. 69 ¶ 23.)

For their part, Defendants acknowledged in oral argument that they acted in concert with respect to the parking garage. (Tr. of Oral Argument, Doc. 80 at 33.) However, they deny that such action constitutes a "conspiracy" motivated by improper personal or political ends. (See, e.g., Answer of All Defendants Except Boyd Hughes, Doc. 47 ¶ 29; Answer of Hughes, Doc. 46 ¶ 29.) Rather, Defendants aver that the parking garage matter was simply part of a redevelopment project which, like many such projects, is a joint venture by state, local and private entities. (See generally Doc. 80 at 16–20.)

## II. Analysis

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment will lie only if the factual dispute is not a genuine one, that is, if the evidence adduced by the parties is such that no reasonable jury could return a verdict for the nonmoving party under the governing evidentiary standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–53, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986).

In addition to arguing that Plaintiffs' claims fail on the merits, Defendants have raised preliminary issues of standing, ripeness and collateral estoppel in their motion for summary judgment. With regard to the preclusion issue, the court

notes that, since the courts of the Commonwealth only determined that the SRA's condemnation was proper under state law and not arbitrary and capricious, Plaintiffs' claims based on the city's termination of the lease are not precluded. (See December 15, 1999 Memorandum Opinion of the Commonwealth Court, Doc. 53, Exhibit E.)

■ With regard to the standing issue, the court concludes that Anthony Rinaldi does not have standing to bring any of the claims in this case. He is not a party to the city's sale agreement with Scranton Life, nor to its lease agreement with Adams Parking. His interest is that of a shareholder in both corporations, and as such he has no standing to advance the claims of either one. *See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336, 110 S.Ct. 661, 665, 107 L.Ed.2d 696 (1990) (the shareholder standing rule prohibits shareholders from initiating actions to enforce the rights of the corporation unless they have a direct, personal interest in the cause of action beyond that of mere shareholders).

■ As for Scranton Life, that plaintiff has standing to raise the contract claim as a third party beneficiary, since one can infer that the lease agreement was intended to benefit Scranton Life from the fact

that Scranton Life made the execution of such a lease a precondition to its sale of the property to the city. (See Sale Agreement, Doc. 69, Exhibit J ¶ 5.)[2] However, Scranton Life does not have standing to pursue the equal protection claim. Only Adams Parking, the actual lessee, may complain that other lessees of the city received benefits from the SRA when the SRA condemned the city's property. *See Alcan Aluminium Ltd.*, 493 U.S. at 336, 110 S.Ct. at 665 (a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties"). Finally, the court will defer the question of whether either corporation has standing to bring the due process claims until after the court has considered the nature of those claims.[3]

### A. Breach of Contract

■ Plaintiffs allege that Defendants breached the lease agreement by conspiring "to take plaintiffs' property, the lease, without paying for it." (Brief, Doc. 67 at 45.) However, regardless of whether Defendants "conspired" with one another, there was no breach of contract unless the city's termination of the lease constituted such a breach.[4] If the city acted within its rights when it terminated the lease, neither it nor any other defendant will be

2. Of course, Adams Parking also has standing to raise a breach of contract claim, as it was a party to the lease.

3. Because the court is satisfied that each of the corporate plaintiffs has a sufficiently personal, concrete and redressable stake in the controversy to satisfy the constitutional requirements of Article III standing, the issue of whether one corporation is raising the due process rights of another is a matter of prudential standing that does not affect this court's jurisdiction. *See Alcan Aluminium Ltd.*, 493 U.S. at 335–36, 110 S.Ct. at 664–65. Further, the court's jurisdiction is not hindered by Defendants' assertion that the due process claims are unripe. The court will conclude, *infra*, that Plaintiffs' due process claims are ripe for review. However, because Plaintiff's due process claims are not set forth with clarity, the court must delay its ripeness discussion until after those claims have been analyzed.

4. The courts of the Commonwealth have already determined that the SRA's condemnation was in conformance with state law and, in any event, the SRA was not a party to the lease. Further, nothing in the lease prohibited the city from seeking to persuade a public authority to condemn the property legitimately. Thus the only question for the court is whether the SRA's condemnation sufficed to trigger the city's right to terminate.

liable for breach of contract. Accordingly, the language of the termination provision is critical:

> If any governmental authority (including the United States of America, the Commonwealth of Pennsylvania, or any political subdivision of the Commonwealth or public authority created under its laws), or any private corporation possessing the power of Eminent Domain (collectively, a "Condemnor"), shall exercise any right of Eminent Domain and acquire in condemnation all of the Building, or any portion thereof, .... the Landlord and the Tenant shall each thereafter have the right to terminate this Lease by written notice to the other, such termination to be effective as of the date that the Condemnor acquires title, and all rents shall thereafter abate, provided, however, that until such time as the Condemnor shall obtain possession thereof, the Tenant shall nevertheless continue in possession on a month to month basis on all the terms and conditions of the lease....

(Doc. 69, Exhibit C ¶ 13.) This provision clearly states that the lease is terminable once the property is condemned by a "public authority created under [the Commonwealth's] laws." Because the Scranton Redevelopment Authority is such a public authority, see 35 P.S. § 1704, its acquisition of title to the garage by condemnation conferred on the city the contractual authority to terminate the lease.

Plaintiffs argue that the SRA's condemnation was a sham because a public entity, the city, already owned the property. (See Doc. 80 at 45, 53–54.) Plaintiffs also point to evidence that the city had been prepared to simply transfer the property to the SRA in return for one dollar. (See Hughes Aff., Doc. 69, Exhibit G at 11–12.) According to Plaintiffs, this establishes that the SRA did not condemn the property in good faith, but merely to save the city the expense of buying out the lease or paying damages for breach. (See Doc. 67 at 45.)

█ The court finds the sham condemnation argument unpersuasive. It is well settled in Pennsylvania law that "[a]n authority under the Urban Redevelopment Law is an agent of the Commonwealth and not of the local government body. As can be seen, the legislature in no uncertain terms has made it clear that a redevelopment authority is a completely separate entity from the city." *Herriman v. Carducci*, 475 Pa. 359, 380 A.2d 761, 763 (1977). *See also Harris v. City of Philadelphia*, 1997 WL 343597 (E.D.Pa.). Therefore, the condemnation by the SRA was a true condemnation that caused title to pass from one distinct entity to another and transferred the premises in question from local to state control. Moreover, the courts of the Commonwealth have already determined that the condemnation was lawful and done for a legitimate purpose.

█ While the fact that the city was prepared to sell the property to the SRA for one dollar is strong evidence that the two entities were working together and that they sought to reduce the cost of the project by condemning the parking garage rather than buying out the lease, such circumstances do not establish a breach of contract. Provided that Defendants do not violate the terms of their contractual agreements, it is not unlawful for them to work together to achieve their common goal of urban redevelopment in the most cost-effective manner possible.

Undoubtedly, Adams Parking would have preferred to have a contract that did not allow for termination upon condemnation or allowed it only where specified governmental entities condemned the property. But this is not the contract the parties signed. The lease signed by the

parties allows the city to terminate upon condemnation of the premises by "any governmental authority," indicating parenthetically that the phrase "any governmental authority" includes *any public authority* created under the laws of the Commonwealth. Thus it should have come as no surprise to Plaintiffs that condemnation by the SRA would trigger the city's right to terminate.

Plaintiffs' argument is further undercut by the fact that the redevelopment statute expressly contemplates the condemnation of public property—such as property owned by a municipality—by a redevelopment authority of the Commonwealth. Section twelve of the Urban Redevelopment Law, which describes the eminent domain power of a redevelopment authority, contains the following provision: "If any of the real property in the redevelopment area which is to be acquired has, prior to such acquisition, been devoted to another public use, it may, nevertheless, be acquired by condemnation: Provided, That no real property belonging to the city, county or to the Commonwealth may be acquired without its consent." 35 P.S. § 1712. This statutory provision should have alerted Adams Parking to the possibility that the SRA might eventually condemn the city's title to the parking garage, especially given the broad "any governmental authority" language contained in the lease's termination provision.

The plain language of the lease termination provision allowed the city to terminate the lease once the SRA condemned the property. While Plaintiffs might regret that Adams Parking signed a contract that turned out to be less advantageous than they had hoped, this court cannot look beyond the plain meaning of an unambiguous contract to judge the fairness of its terms. *See Eichelman v. Nationwide Ins. Co.*, 551 Pa. 558, 711 A.2d 1006, 1008

(1998) ("Generally, a clear and unambiguous contract provision must be given its plain meaning unless to do so would be contrary to clearly expressed public policy."); *Lobaugh v. Lobaugh*, 753 A.2d 834, 836 (Pa.Super.2000) (when the contractual language is clear and unambiguous, the court "must construe the contract only as written and may not modify the plain meaning under the guise of interpretation"). Accordingly, Defendants are entitled to summary judgment on Plaintiffs' breach of contract claim.

### B. Substantive and Procedural Due Process

It is unclear from the allegations in the complaint and the parties' briefs whether or not Plaintiffs' substantive due process claim is actually a claim for just compensation—what the Eleventh Circuit has termed a "due process takings claim." *See generally Eide v. Sarasota County*, 908 F.2d 716 (11th Cir.1990). There is some basis in the complaint for construing the claim as a due process takings claim, in that the complaint avers that the lease was part of the consideration Scranton Life received under the sale agreement. (Doc. 45 ¶¶ 16–18.) Since the consideration given to Scranton Life under the sale agreement was in lieu of the just compensation Scranton Life would have received had the property been condemned, it is possible that Scranton Life is alleging that Defendants unlawfully exercised the lease termination provision to deprive them of part of that consideration and circumvent the requirements of the just compensation clause. Certainly Defendants favor this theory since, as their brief points out, just compensation claims arising in the Commonwealth are not ripe until the plaintiff has appealed the compensation decision to a Commonwealth Board of View. See 26

P.S. § 1–502–14. (See also Defendants' Brief, Doc. 52 at 26–28.)[5]

However, both the complaint and Plaintiffs' brief are better understood to argue that Defendants' improper motive in terminating the lease constituted a violation of substantive due process. First of all, Plaintiffs rely primarily on *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685 (3d Cir.1993), a case in which the defendant municipality violated substantive due process by terminating the plaintiff's lease. (See Brief, Doc. 67 at 27–30.) Second, the operative complaint repeatedly refers to Defendants' alleged improper motives. (See Doc. 45 ¶¶ 22, 29, 31, 34, 38, 41, 51–53.) As improper motive is relevant to a substantive due process claim like that in *Parkway Garage* but not to a just compensation claim, the court concludes that the first count of Plaintiffs' second amended complaint should be understood to assert a substantive due process claim based on Defendants' alleged improper motive in terminating the lease.[6]

■ Once Plaintiffs' substantive due process claim has been more precisely delineated, it is apparent that the claim is fully justiciable. Defendants' ripeness objections, founded on their characterization of the claim as one for just compensation, are inapplicable to an improper motive due process claim. (See Defendants' Brief, Doc. 52 at 12–14.) Further, since the causes of action arose from the termination of the lease, both Adams Parking and Scranton Life have standing to bring the due process claims.

■ Turning to the merits of Plaintiffs' substantive and procedural due process claims, the court concludes that both claims must fail for lack of a property interest protected by the Due Process Clause. As the court noted above, the lease signed by Adams Parking allowed the city to terminate upon condemnation of the property, even where the condemnor was the SRA. Because Adams Parking was not entitled to a longer lease under state law, it was not deprived of a cognizable property interest when the city exercised its right to terminate. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) ("Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings from an independent source such as state law...."). As the *Roth* court noted, a plaintiff's unilateral expectation that he will receive or retain something of value is not enough to create a protectable property interest. *Id.* at 576, 92 S.Ct. at 2709. "He must, instead, have a legitimate claim

---

5. In determining which theory Plaintiffs are asserting, one thing is certain: it is the city's exercise of the termination provision, not SRA's condemnation the city's property, that Plaintiffs must challenge. The condemnation itself cannot be challenged in this court under a theory that the decision to condemn was made arbitrarily and capriciously or for an improper motive. It has already been fully litigated and conclusively determined in the courts of the Commonwealth that the city's property was condemned due to blight, not arbitrarily or capriciously. (See Memorandum Opinion of the Commonwealth Court, Doc. 53, Exhibit E.)

6. On Defendants' motion for summary judgment, it is appropriate for the court to construe Plaintiffs' claims in the manner most favorable to Plaintiffs. While the complaint jumbles together allegations that the condemnation was improper and based on an improper motive, that the condemnation breached the lease, that the termination breached the lease, and that the termination was based on an improper motive, the court should allow the case to proceed to trial if there is any tenable theory that fits the allegations of the complaint and contains a genuine issue of material fact.

of entitlement to it." *Id.* In the instant case, Adams Parking signed a lease that allowed its landlord to terminate the lease relationship as soon as "any governmental authority" took title to the property by condemnation. Because Adams Parking lacked a legitimate claim of entitlement to a longer lease under state law, Plaintiffs have failed to state a viable substantive or procedural due process claim.

Plaintiffs direct the court to *Parkway Garage v. City of Philadelphia*, 5 F.3d 685 (3d Cir.1993), arguing that it is "especially on point because there, as here, the city used a pretext to terminate a lease, in bad faith." (Brief, Doc. 67 at 29.) However, *Parkway Garage* is distinguishable from the instant case. In *Parkway Garage*, the defendant city triggered its right to cancel the lease by claiming that the garage was "in imminent danger of collapse" and summarily closing it. *Id.* at 690. After the plaintiff presented weighty evidence that the defendant had little or no basis for believing that the garage was in danger of collapsing, and that the defendant's stated reason for closing the garage was a pretext designed to allow the defendant to reap the economic benefits of canceling the lease, a jury awarded the plaintiff $5 million on its due process claim. *Id.* at 688, 693–98. When the district court subsequently entered judgment for the defendant notwithstanding the verdict, the Third Circuit reversed, holding that the plaintiff had produced sufficient evidence at trial to support a jury verdict in its favor.

■ In reaching its decision, the *Parkway Garage* court held that the defendant violated substantive due process when, based on an "improper economic motivation," it closed the plaintiff's garage on a pretextual public safety ground. *Id.* Notably, the court did not hold that any economic motive is enough for a substantive

due process violation, but only an *improper* economic motive. In footnote six of the *Parkway Garage* opinion, the court stated:

> Whether a city has acted with an improper motive is a factual question. We [have given] examples of improper motivation as political motivation or racial animus, to which we now add *in the circumstances of this case*, economic motivation. *Economic motivation may be, and often is, a laudable justification for human behavior, but not under the circumstances of this case.*

*Id.* at 697 n. 6 (internal quotes and citations omitted) (emphasis added). Though the *Parkway Garage* court did not specify what circumstances in that case made the municipality's pursuit of economic advantage unconstitutional, the necessary inference is not difficult. This court holds that the economic motive of a state actor violates due process only where the state actor makes a pretextual use of its governmental power for proprietary gain.

■ In *Parkway Garage*, the city did not have a contractual right to terminate the lease. Rather, it misapplied its power to close unsafe structures in order to create a "default" by Parkway Garage under the lease. In other words, it misused its power to regulate private structures for the public safety, a public sector power, in order to gain an economic advantage in a private sector relationship. In the present matter, the City of Scranton did not misuse its regulatory power. Indeed, the city did not even exercise a governmental power, but acted in a wholly proprietary capacity when it exercised its contractual right of termination. Only the SRA, an entity entirely separate from the city, acted in a governmental capacity, and its action—far from being a misuse of governmental power—was a legitimate action that twice has been upheld in state court. Accordingly, the circumstances which made the defen-

dant's economic motive improper in *Parkway Garage*—the pretextual use of public sector power for private sector gain—are absent in this case. The City of Scranton's pursuit of economic efficiency in its redevelopment project was entirely proper and consistent with its obligation to the taxpayers of Scranton.

In light of the foregoing, Defendants' motion for summary judgment will be granted as to the due process claims.

### C. Equal Protection

 Plaintiffs' equal protection claim, the fourth and final count of the second amended complaint, is founded on the allegation that other property owners who were similarly situated to Adams Parking "have been compensated for the condemnation of their property." (Doc. 45 ¶ 67.) Plaintiffs are correct that the Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 1074, 145 L.Ed.2d 1060 (2000). However, Plaintiffs have presented no evidence whatsoever that Adams Parking was similarly situated to the city's other tenants on the parking garage property. (See Brief, Doc. 67 at 36.) Critically, Plaintiffs have not established that the leases of the other tenants contained a termination provision similar to the one in the Adams Parking lease. If the other leases were free of such a termination provision, they, unlike the Adams Parking lease, would not have been worthless upon condemnation. The absence of termination provisions in the other leases would fully explain why some tenants were compensated by the SRA and others were not.

Plaintiffs have also failed to present evidence of exactly what "benefits" were denied them but given to other tenants and subtenants. (See id.) While this court can speculate that the benefits in question were condemnation damages, such speculation cannot be the basis of a viable equal protection claim. Because Plaintiffs' evidence is too sketchy to allow a reasonable jury to find that Defendants arbitrarily accorded Plaintiffs disparate treatment, Defendants are entitled to summary judgment on Plaintiffs' equal protection claim.

### III. Conclusion

This lawsuit likely originated in Plaintiffs' disappointment in the lease it signed with the city. That agreement, whose plain language allowed the city to terminate should the SRA or another governmental authority condemn the property, was obviously less valuable to Plaintiffs than a thirty year lease without a termination provision. However, Adams Parking must live with the lease it signed.

Because the SRA's condemnation of the premises was entirely proper under state law, the City of Scranton acted squarely within its contractual rights and within the confines of due process when it terminated the Adams Parking lease. Indeed, the city probably had a duty to its residents to terminate the lease, in order to accomplish redevelopment as economically as possible.

The court is not unaware of the fact that Plaintiffs adduced evidence of personal animosity towards Plaintiff Rinaldi on the part of the individual defendants. However, the personal animosity among the parties does not affect the scope of their contractual or constitutional rights. Nor will it suffice in the absence of other evidence to establish that the governmental defendants denied Plaintiffs benefits which were accorded to similarly situated persons. Therefore, Defendants' motion for

summary judgment will be granted as to all four of Plaintiffs' claims.

An appropriate order will follow.

## *ORDER*

**NOW,** this _____ day of April, 2001, **IT IS HEREBY ORDERED that:**

1. Defendants' motions for summary judgment (Docs.51, 57) are **GRANTED;**

2. The Clerk of Court is directed to close this case.